IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTONIO PEARSON, | : |
| Plaintiff | : |
| | :   CIVIL NO. 1:CV-13-1733 |
| vs. | : |
| | :   (Judge Caldwell) |
| DAVID VARANO, *et al.*, | : |
| Defendants | : |

*M E M O R A N D U M*

I.   *Introduction*

The pro se plaintiff, Antonio Pearson, a state inmate formerly housed at the State Correctional Institution in Coal Township, Pennsylvania, (SCI-Coal)[1] brings this action against the following Pennsylvania Department of Corrections (DOC) employees: John Wetzel, Secretary; Shirley Moore-Smeal, Executive Deputy Secretary; Michael Klopotoski, Eastern Regional Deputy; Jeffrey Baker, the Staff Assistant to the Eastern Regional Deputy; Dorina Varner, Chief Grievance Officer; David Varano, Superintendent of SCI-Coal; Rhonda Ellet and Robert McMillan, Deputy Superintendents at SCI-Coal; and Antoinette Shedleski and John Snyder, SCI-Coal food service employees.

Before the court is Defendants' motion for summary judgment concerning Pearson's "class-of-one" equal-protection claim. Pearson worked the third shift in SCI-Coal's culinary department and claims he routinely worked a shift of eight hours and forty-

---

[1] Pearson is currently housed at SCI-Greene.

five minute, but was only paid for eight hours of work while inmates on other shifts worked eight hours or less and were paid for eight hours of work.

The court agrees with Defendants that the undisputed facts do not support a class-of-one equal-protection claim.  Accordingly, we will grant Defendants' motion for summary judgment.

II.     *Standard of Review*

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is material if it might affect the outcome of the suit under governing law."  *Lupyan v. Corinthian Colls. Inc.,* 761 F.3d 314, 317 (3d Cir. 2014)(citing *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011)).  The court "must view all evidence and draw all inferences in the light most favorable to the non-moving party," and we will only grant the motion if "no reasonable juror could find for the non-movant."  *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

At summary judgment the moving party must identify evidence that demonstrates an absence of a genuine issue of material fact.  *Budhun v. Reading Hosp. and Medical Cntr.*, 765 F.3d 245, 251 (3d Cir. 2014)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).  The movant must support his position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by showing that the nonmoving party "failed to make a sufficient showing to establish the existence of an element essential" to that party's case.  *Celotex*, 477 U.S. at 322, 106. S.Ct. at 2552.

If the moving party meets this initial burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).  "The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial."  *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  The nonmoving party must "go beyond the pleadings" and either by affidavits, deposition, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

The nonmoving party "must support the assertion" that a fact is genuinely in dispute by: "(A) citing to particular parts of materials in the record . . .; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); see also Fed. R. Civ. P. 56(e)(2) (if a party fails to properly support an assertion of fact, or address another party's assertion of

fact, the court may consider the fact undisputed for the purpose of the motion).  An unsworn statement does not satisfy the requirements of Fed. R. Civ. P. 56(c)(4) that summary judgment materials be "made upon personal knowledge, [and] set out facts that would be admissible in evidence . . ."  *Woloszyn v. Cnty of Lawrence*, 396 F.3d 314, 323 (3d Cir. 2005).

Likewise, a non-moving "party cannot create a material issue of fact to defeat summary judgment by submitting an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict."  *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (*citing Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)). "This principle of summary judgment practice is often referred to as the 'sham affidavit doctrine'."  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007).  However, "[w]here there is independent evidence in the record to bolster an otherwise questionable subsequent affidavit, district courts generally refuse to disregard the affidavit."  *Baer*, 392 F.3d at 625.

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322 – 23, 106 S.Ct. at 2552; *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

III.    *Statement of Facts*

The following facts are undisputed or, where disputed, reflect Pearson's version of the facts, pursuant to this court's duty to view all facts and reasonable inferences in the light most favorable to the nonmoving party.

Antonio Pearson started working in SCI-Coal's kitchen on December 25, 2010.  (Doc. 59, Defs.' Statement of Material Facts (DSMF), ¶1 and Doc. 77, Pl.'s Resp. to Defs.' Statement of Material Facts (PSMF), ¶ 1).  The kitchen is operated on four shifts of inmate workers.  (DSMF 2; Doc. 60-2, Ex. B, ECF p. 19).  The first shift starts at approximately 4:00 a.m. and ends at approximately 11:00 a.m.  (DSMF ¶ 3; Doc. 60-2, Ex. B, ECF p. 7).  The second shift starts at approximately 5:00 a.m. and ends at approximately 1:00 p.m.  (DSMF ¶ 4; Doc. 60-2, Ex. B, ECF p. 7.)  Although the second shift ends at 1:00 p.m., because their work ends in the middle of an institutional count, and inmates are not permitted to leave the kitchen until the count is completed, second-shift workers may be required to remain in the kitchen until count is cleared.  (DSMF ¶ 5).[2]  The third shift (Plaintiff's shift) starts at approximately 10:00 a.m. and ends at 6:00 p.m.  (DSMF ¶ 6).[3]  An institutional count takes place toward the end of this shift.  (Doc. 60-2, ECF p. 13).  Depending on how the evening meal ran, what was served, etc, the count could start at

---

[2] "Count is when [prison officials] count the inmates to see how many — to make sure that everybody's in jail that's supposed to be there and everybody is accounted for."  (Doc. 60-2, Ex. B, ECF p. 8).  Institutional counts can take anywhere from ten to twenty minutes.  If a recount is necessary, it could be longer.  (*Id.*, ECF pp. 8 - 9).  Institutional counts take place around 6:00 a.m., 1:00 p.m., and 6:00 p.m., give or take thirty minutes depending on when inmate meals are finished. (*Id.*; DSMF ¶ 12).

[3] Most of the time Pearson finished working by 6:00 p.m.  (Doc. 60-2, ECF p. 15).

5:45 p.m., 6:00 p.m. or even 6:10 p.m.[4]  (*Id.*)  Inmates are not permitted to leave the kitchen area until the count is completed, and this may extend their stay until 6:30 p.m. or 6:45 p.m.  (DSMF ¶ 7; Doc. 60-2, ECF pp. 8-9).  The fourth shift begins at 2:30 p.m. and ends at 6:00 p.m.  (DSMF ¶ 8).[5]

The first three shifts are paid for eight hours of work.  (DSMF ¶ 10; PSMF ¶ 10).  The number of hours each of the first three shifts works are roughly the same or very close to each other.  (DSMF ¶ 11).  During the workday, in addition to institutional counts at 6:00 a.m., 1:00 p.m., and 6:00 p.m., internal kitchen counts are taken at various times.  (Doc. 60-2, ECF pp. 9-10 and 12).  The amount of time it takes to clear count varies from ten to twenty minutes depending on when meals are finished or what is going on in the institution and whether a recount is necessary.  (Doc. 60-2, ECF pp. 8-9; DSMF ¶ 14; PSMF ¶ 14).   Only one institutional count takes place during the first shift.  (DSMF ¶ 25; Doc. 75-1, ECF p. 26).  Two institutional counts take place during the second and third shifts.  The evening institutional count takes longer because there are more inmates working in the kitchen.  (DSMF ¶ 14).

Inmates are not permitted to work during institutional counts.  (DSMF ¶ 13).  During count, inmates "just sit down at a table" or "stand around" until count is complete.  (Doc. 60-2, ECF p. 10 and p. 12).  Following the 6:00 p.m. count, there is "move time"

---

[4] Pursuant to DC-ADM 801, *Inmate Discipline Procedures Manual,* an inmate may receive a misconduct for failing to stand count or interfering with count.  This policy may be found on the DOC's website, http://www.cor.pa.gov.

[5] The fourth shift does not get paid for eight hours and Pearson does not suggest he is similarly situated to inmates who work that shift.  (DSMF 9; PSMF ¶ 9; Doc. 60-2, ECF p. 33).

within the institution where inmates who have passes or who are on "call out" are permitted to go to certain locations.  (Doc. 60-2, ECF pp. 14-16).  Third-shift workers who do not have a pass must wait until count and then "move time" are complete before they are released from the kitchen.  (*Id.*)

Inmates who do not work in the kitchen eat breakfast around 6:30 a.m., lunch around 10:45 a.m. and dinner around 4:05 p.m.  (DSMF ¶ 16; PSMF ¶ 16; Doc. 60-2, ECF p. 8).  Inmates generally take longer to eat lunch and dinner than breakfast because there is less food involved with breakfast.  (DSMF ¶ 17).

Inmate workers on the first, second and third shifts are fed two meals during their shift.  (DSMF ¶ 15 and ¶ 18; PSMF ¶ 15 and ¶ 18; Doc. 60-2, ECF p. 7).  Generally, inmates on the first three shifts (shifts starting at 4:00 a.m., 5:00 a.m. and 10:00 a.m.) eat a meal at the beginning of their shifts.  (Doc. 60-2, ECF p. 7).  A half hour is allotted for inmate workers to eat each meal.  (Doc. 75-1, ECF p. 33).  As inmates are not working while they are eating, they are not compensated for this time.  (DSMF ¶ 15; Doc. 75-1, ECF p. 18).

Depending on the time of day there may be anywhere from fifty to one hundred inmates working in the kitchen.  (Doc. 60-2, ECF p. 7).  The first and second shifts overlap with inmates assigned to the third shift.  (*Id.*)  As the first shift (4:00 a.m. to 11:00 a.m.) is comprised of more senior workers, rather than try to release these workers in the middle of the "mainline" movement of the general population for lunch (12:00 p.m.), SCI-Coal officials made the decision to release them prior to the mainline but continue to pay

-7-

them for the full eight-hour shift.  This decision was made at the time the evening shift was eliminated and changes were made to staff and inmate schedules.  (DSMF ¶ 26; Doc. 75-1, ECF p. 26).

In the afternoon, right after the 1:00 p.m. institutional count is complete, the kitchen conducts an internal count so that inmates on the second shift may leave.  (*Id.*, ECF p. 10).  Pearson and other third-shift inmates had to stand around until that count was done.  (*Id.*, ECF p. 12).  The kitchen conducts another count shortly after the fourth shift (2:30 p.m. to 6:00 p.m.) workers arrive.  (*Id.*, ECF p. 12).  The nighttime institutional count is conducted after the dinner meal is finished.  (*Id.*, ECF p. 9).  When the evening count starts depends on "how the meal ran, what was served, if anything happened."  (*Id.*, ECF p. 13).

While at SCI-Coal, Pearson elected to work third shift.  (DSMF ¶ 6; PSFM ¶ 6).  During the shift he was fed twice and participated in two institutional counts.  He did not work during these periods and was not compensated for this time. (DSMF ¶ 18; PSMF ¶ 18; Doc. 60-2, ECF p. 10).  His workday was complete by 6:00 p.m.  (DSMF ¶ 19; PSMF ¶ 19; Doc. 60-2, ECF p. 15).  However, he was not permitted to leave the kitchen until the 6:00 p.m. institutional count cleared and the evening "move time" was complete unless he had a 6:00 p.m. "call-out" slip.  (DSMF ¶ 20; PSMF ¶ 20; Doc. 60-2, ECF pp. 15-16).  To release third-shift kitchen workers prior to the completion of the evening institutional count would jeopardize that count and interfere with institutional security.  (DSMF ¶ 20).

From 6:00 p.m. to 6:45 p.m., third-shift workers without a 6:00 p.m. pass sat around and did nothing.  (DSMF ¶ 21; PSMF ¶ 21; Doc. 60-2, ECF p. 15).  This forty-five-minute period when Pearson was not working, but was prohibited from leaving the kitchen, is the crux of his complaint.  (DSMF ¶ 22; PSMF ¶ 22; Doc. 60-2, ECF pp. 15 - 16).  If prohibited from leaving the kitchen, Pearson believes he should be paid for this time.[6]  (*Id.*)

Pearson worked all of the various kitchen shifts at SCI-Coal but preferred the third shift.  (Doc. 60-2, ECF pp. 18-21).  Third shift was more convenient for Pearson than the other shifts.  (*Id.*)  Pearson did not have any medical problems that required him to work only third shift, or prevented him from working the first or second shift.  (*Id.*; Doc. 75-1, ECF p. 48).  Pearson was offered the opportunity to work a different shift but elected not to switch.  (Doc. 75-1, ECF p. 50).

If the actual time Pearson's shift was required to remain in the kitchen differed from the second shift (5:00 a.m. to 1:00 p.m.), it was because inmates on Pearson's shift ate both lunch and dinner and were present for the institutional dinner count which takes longer than earlier counts.  (DSMF ¶ 23).  The count during dinner time and the dinner-

---

[6] Pearson succinctly describes his concern:

> If they can let me leave at 6:00 pm during this month of Ramadan and have the 2:00 pm workers stay and clean up until 6:45 pm, why can't this be done all the time, because my work is finished at this time and if they are going to make me stay until 6:45 pm then I want to be paid for this time.

Doc. 75-1, ECF p. 30; *see also* ECF pp. 35 - 36, Grievance. 381333.

meal period take more time than the count and meal period on the 5:00 a.m. to 1:00 p.m. shift. (DSMF ¶ 24).

The DOC's *Inmate Compensation* policy, DC-ADM 816, reads that a "standard workday consists of six hours, and the standard workweek consists of five days. The total number of . . . work hours . . . may not exceed eight hours multiplied by the number of workdays available in the pay period." (Doc. 75-1, ECF p. 18).  Inmates working inside the facility may not receive overtime, except under emergency situations and with the approval of the Facility Manager/designee. (*Id.*)  The policy defines an inmate's "Job Hours" as "[w]ork time begins when the inmate makes contact with the work supervisor for the purpose of work or reports to the work site, whichever comes first.  Work time terminates when the work supervisor releases the inmate." (*Id.*, ECF p. 20).

IV. *Discussion*

Defendants raise three grounds for summary judgment on Pearson's class-of-one equal-protection claim.  First, Pearson has failed to establish the elements of an equal-protection claim.  Second, Defendants are protected from suit by the doctrine of qualified immunity.  Third, Pearson has failed to establish the personal involvement of all defendants other than Shedleski and Snyder.  Because we find the first ground dispositive, we need not discuss the remaining ones.

The Equal Protection Clause guarantees "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike."

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). For a class-of-one equal-protection claim, a plaintiff must allege he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000). As the Third Circuit has put it, to state a claim under the class-of-one theory, a plaintiff must show that "'(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.'" *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 245 (3d Cir. 2008)(quoted case omitted); *see also Chavarriaga v. N.J. Dept. of Corrections*, 806 F.3d 210, 233 (3d Cir. 2015)(quoting *Phillips*).

We begin our examination of Pearson's equal-protection claim with a determinations of whether he was treated differently than similarly situated inmates. This analysis requires us to determine whether there are other similarly situated inmate kitchen workers like Pearson.

Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant respects.'" *Patterson v. Strippoli,* ___ F. App'x ___, ___, 2016 WL 231532, at *3 (3d Cir. 2016)(nonprecedential)(quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)). Here, there are some similarities. There were four different shifts of kitchen workers at SCI-Coal while Pearson was there, and it is not disputed that three of those shifts were paid for eight hours of labor: the first shift (4:00 a.m. to 11:00 a.m.), the second shift (5:00 a.m. to 1:00 p.m.), and the third shift (10:00 a.m. to 6:00 p.m.).

Additionally, inmates working each of these shifts were provided two meals during the shift. Further, none of the inmate workers were paid for their meal breaks or for time spent idle while institutional or kitchen counts were conducted.

There are differences. The first shift (4:00 a.m. to 11:00 a.m.) only sits through one institutional count (6:00 a.m.) while the second and third shifts sit through two institutional counts.[7] The third shift, Pearson's shift, also sits through at least one internal kitchen count around 3:00 p.m. or 3:30 p.m. which coincides with the arrival of the fourth-shift workers.

These similarities and differences lead to the following calculations. Although inmates on the first three shifts are paid for eight hours of work each day, after deducting meal and count times[8] from the worker's day, inmates on the first shift (4:00 a.m. to 11:00 a.m.) work approximately 5.5 hours, inmates on the second shift (5:00 a.m. to 1:00 p.m.) work approximately 6.0 hours, and inmates on the third shift (10:00 a.m. to 6:00 p.m.) work approximately 6.0 hours. Thus, for the purpose of Pearson's class-of-one equal-protection claim, as to hours worked, Pearson is similarly situated to inmate workers employed on the first and second shifts.

---

[7] The second shift (5:00 a.m. to 1:00 p.m.) sits through the 6:00 a.m. count and the 1:00 p.m. count. The third shift (10:00 a.m. to 6:00 p.m) sits through the 1:00 p.m. count and the 6:00 p.m. count.

[8] A half hour is allotted for each meal period. As the amount of time to conduct count is inconsistent and there is no average time established by the record, we will also allow half an hour for each count. While not an exact figure, applying it across all three shifts should yield a fair and representative work day for comparative purposes.

Next, we must determine whether Pearson was treated differently in the terms of his hours of labor and compensation than inmates on the first and second shifts. Pearson's equal-protection claim is that he was compensated the same as inmates working the first and second shifts even though he was physically present in the kitchen longer. This claim is unsupported.[9] First, all three shifts received eight hours of pay even though none of them actually worked an eight-hour day. Second, although the DOC *Inmate Compensation* policy states that inmates are to be paid from the time they report to the work site until they are released by their supervisors, there is no evidence in the record to suggest kitchen workers are to be compensated for 100% of the time they are physically present in the kitchen; the *Inmate Compensation* policy specifically excludes payment for mealtimes. Pearson testified that kitchen workers are usually fed their first meal upon arriving at the job site. Accordingly, there is evidence in the record to support a finding that kitchen workers, even when at the job site, are not paid for all the time they are in the kitchen simply based on their presence at the work site.

Likewise, Pearson does not offer any evidence to suggest that other inmate workers, who are fed at their job sites, are paid for the entire time they are at their work site. Thus, Pearson has not demonstrated that the SCI-Coal officials compensated or treated inmates on the third shift, his shift, differently from other kitchen workers who

---

[9] Pearson does not dispute that his work day ends at 6:00 p.m. Rather, he takes issue with the period of time he was required to remain in the kitchen after 6:00 p.m. "doing nothing" and was not compensated. While at SCI-Coal, Pearson had enough seniority to choose what shift he preferred to work. Given the opportunity to switch shifts, and still receive eight-hours pay, Pearson elected to remain on the third shift. Pearson was medically cleared to work all shifts.

received pay for an eight-hour shift.   Moreover, inmates on the first shift (5:00 a.m. start time), similar to the second shift (10:00 a.m. start time), concluded their work days at or near the time an institutional count was conducted.  So both shifts were prohibited from leaving the worksite until count was cleared and neither shift was compensated for this wait time.

Pearson also argues SCI-Coal officials intentionally treated him differently than the first shift.  He points to the fact that the first shift receives eight hours of pay when only scheduled for seven hours of work (4:00 a.m. to 11:00 a.m.), while he received eight hours of pay while scheduled to work an eight-hour day (10:00 a.m. to 6:00 p.m.).  Even if similarly situated, Defendants are still entitled to summary judgment on this claim as they present a rational basis for the difference in treatment for the first shift.

When SCI-Coal had to eliminate its evening kitchen shift, changes were made to staff and inmate schedules.  In order to avoid releasing the first-shift workers, which is made up of more senior workers, in the middle of the mainline movement of the general population for lunch (12:00 p.m.), a decision was made to release them just prior to the start of mainline (around 11:00 a.m.) and pay them for a full eight-hour day.  Prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices designed in their judgment to preserve internal order and discipline and to maintain security. *See Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977) ("Because the realities of running penal institutions are complex and difficult, we have also recognized the wide-ranging

-14-

deference to be accorded the decisions of prison administrators.")  Controlling the internal movement of inmates within the facility at any given time would fall within the discretionary decisions left to prison administrators.  Here, prison officials made a strategic decision to avoid releasing first-shift workers at the same time as a mainline movement.  Prison officials also elected not to penalize the inmates on this, the earliest shift, for a decision officials made to maintain the orderly running of their facility.  Because it is Pearson's burden "to negative any reasonably conceivable state of facts that could provide a rational basis for the classification," *Bd. Of Trustees of Univ. Of Ala. v. Garrett*, 531 U.S. 356, 367, 121 S.Ct. 955, 964, 148 L.Ed.2d 866 (2001)(quoted case omitted)(internal quotations omitted), he has failed to adequately allege an equal-protection claim.

For the same reason, any claim Pearson has that the second and third shifts differ because the second shift can leave after the 1:00 p.m. count has cleared but he could not leave the kitchen without a pass even when the 6:00 p.m. count had cleared, is defeated by prison officials' discretion to control line movements within their facility.  The fact that there is "move time" following the 6:00 p.m. institutional count that restricts the third-shift kitchen workers from leaving the work place until that period is over does not make this distinction between second and third shifts unconstitutional.

Pearson suggests that because he was afforded a 6:00 p.m. pass during Ramadan which allowed him to leave the kitchen following count, prison officials could have made similar arrangements so he could have been excused earlier than others subject to the same movement restrictions (his third-shift co-workers and the fourth shift (2:30 p.m. to

6:00 p.m.) workers).  However, this individualized treatment for Plaintiff would have simply created an equal-protection claim for other workers.

Moreover, we note that, given the opportunity to transfer to a different shift, and still receive eight hours of pay for less than eight hours of work, Pearson declined to do so.  Pearson does not have a physician's note indicating that he cannot work another shift due to medical reasons.  The fact that the prison officials' operation of the prison may be considered imperfect by Pearson because he would prefer to leave his work site immediately upon conclusion of his shift does not offend the Constitution.

An appropriate order follows.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge

Date: March 8, 2016